1

2

3

4

5          **UNITED STATES DISTRICT COURT**

6          **DISTRICT OF NEVADA**

7   PATRICIA WEBB,                          )
                                            )        Case No. 2:12-cv-00592-GMN-PAL
8                          Plaintiff,       )
                                            )        **REPORT OF FINDINGS AND**
9   vs.                                     )        **RECOMMENDATION**
                                            )
10  CAROLYN W. COLVIN,[1]                    )        (Mtn to Reverse - Dkt. #24)
                                            )        (Mtn to Affirm - Dkt. #27)
11                         Defendant.       )
    _____)
12

13         This case involves judicial review of administrative action by the Commissioner of Social

14  Security denying Plaintiff Patricia Webb's claim for disability benefits under Title II of the Social

15  Security Act (the "Act").

16                              **BACKGROUND**

17         On May 8, 2008, Plaintiff filed her application for disability benefits, alleging she became

18  disabled on May 1, 2009. AR[2] 164-169.  The Social Security Administration ("SSA") denied Plaintiff's

19  application initially and on reconsideration. AR 72-76, 81-83.  A hearing before an administrative law

20  judge ("ALJ") was held on September 2, 2010. AR 35-69.  In a decision dated January 25, 2011, the

21  ALJ found Plaintiff was not disabled. AR 18-34.  Plaintiff requested review of the ALJ's decision by

22  the Appeals Council. AR 14-17.  The ALJ's decision became the Commissioner's final decision when

23  the Appeals Counsel denied review on February 8, 2012. AR 4-9.

24  / / /

25

26         [1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on
    February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for
27  Michael J. Astrue as the Defendant in this matter.

28         [2]AR refers to the Administrative Record, which was delivered to the undersigned upon the
    Commissioner's filing of her Answer (Dkt. #21) on February 5, 2013.

1   On April 11, 2012, Plaintiff filed an Application to Proceed In Forma Pauperis (Dkt. #1) and

2   submitted a Complaint (Dkt. #8) in federal court, seeking judicial review of the Commissioner's

3   decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (Dkt. #21) on February

4   5, 2013.  Plaintiff filed a Motion for Remand (Dkt. #24) on March 7, 2013.  The Commissioner filed a

5   Motion to Affirm and Opposition (Dkt. #27) on April 22, 2013.  The court has considered the Motion to

6   Remand and the Opposition and Cross-Motion.

7   **DISCUSSION**

8   **I.    Judicial Review of Disability Determination**

9   District courts review administrative decisions in social security benefits cases under 42  U.S.C.

10   § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after

11   the Commissioner of Social Security has held a hearing and rendered a final decision, a disability

12   claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal district

13   court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. § 405(g).  That statute

14   also provides that the District Court may enter, "upon the pleadings and transcripts of the record, a

15   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with

16   or without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a District

17   Court affirming, modifying, or reversing a decision of the Commissioner de novo.  *Batson v.*

18   *Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

19   The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42

20   U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the

21   Commissioner's findings may be set aside if they are based on legal error or not supported by

22   substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *see also*

23   *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence

24   as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable

25   mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

26   Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005).  In determining

27   whether the Commissioner's findings are supported by substantial evidence, the court "must review the

28   administrative record as a whole, weighing both the evidence that supports and the evidence that

2

1   detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998);

2   *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

3          Under the substantial evidence test, the Commissioner's findings must be upheld if supported by

4   inferences reasonably drawn from the record. *Batson*, 359 F.3d at 1193. When the evidence will

5   support more than one rational interpretation, the court must defer to the Commissioner's interpretation.

6   *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human*

7   *Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995). Consequently, the issue before the court is not whether the

8   Commissioner could reasonably have reached a different conclusion, but whether the final decision is

9   supported by substantial evidence.

10         It is incumbent on the ALJ to make specific findings so that the court does not speculate as to

11  the basis of the findings when determining if the Commissioner's decision is supported by substantial

12  evidence. Mere cursory findings of fact without explicit statements as to what portions of the evidence

13  were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).

14  The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate,

15  should include a statement of subordinate factual foundations on which the ultimate factual conclusions

16  are based." *Id.*

17  **II.    Disability Evaluation Process**

18         The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182

19  (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate

20  an "inability to engage in any substantial gainful activity by reason of any medically determinable

21  physical or mental impairment which can be expected . . . to last for a continuous period of not less than

22  12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must provide "specific medical evidence" to

23  support his or her claim of disability. If a claimant establishes an inability to perform his or her prior

24  work, the burden shifts to the Commissioner to show that the claimant can perform other substantial

25  gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

26         The ALJ follows a five-step sequential evaluation process in determining whether an individual

27  is disabled. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). If at any

28  step, the ALJ makes a finding of disability or non-disability, no further evaluation is required. *See* 20

3

1    C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The

2    first step requires the ALJ to determine whether the individual is currently engaging in substantial

3    gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b).  SGA is defined as work

4    activity that is both substantial and gainful; it involves doing significant physical or mental activities,

5    usually for pay or profit.  *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b).  If the individual is

6    currently engaging in SGA, then a finding of not disabled is made.  If the individual is not engaging in

7    SGA, then the analysis proceeds to the second step.

8           The second step addresses whether the individual has a medically-determinable impairment that

9    is severe or a combination of impairments that significantly limits him or her from performing basic

10   work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of

11   impairments is not severe when medical and other evidence establish only a slight abnormality or a

12   combination of slight abnormalities that would have no more than a minimal effect on the individual's

13   ability to work.  *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-

14   3p, and 96-4p.[3]  If the individual does not have a severe medically-determinable impairment or

15   combination of impairments, then a finding of not disabled is made.  If the individual has a severe

16   medically-determinable impairment or combination of impairments, then the analysis proceeds to the

17   third step.

18          Step three requires the ALJ to determine whether the individual's impairments or combination

19   of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404,

20   Subpart P, Appeix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and

21   416.926.  If the individual's impairment or combination of impairments meet or equal the criteria of a

22   listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of

23   disabled is made.  *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h).  If the individual's impairment or

24   */ / /*

25

26          [3] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r
     of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are

27   entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray,* 554

28   F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

4

1   combination of impairments does not meet or equal the criteria of a listing or meet the duration

2   requirement, then the analysis proceeds to the next step.

3         Before considering step four of the sequential evaluation process, the ALJ must first determine

4   the individual's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5   RFC is a function-by-function assessment of the individual's ability to do physical and mental work-

6   related activities on a sustained basis despite limitations from impairments.  *See* SSR 96-8p.  In making

7   this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which

8   they can reasonably be accepted as consistent with the objective medical evidence and other evidence.

9   *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p.  To the extent that statements about

10  the intensity, persistence, or functionally limiting effects of pain or other symptoms are not

11  substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the

12  individual's statements based on a consideration of the entire case record.  The ALJ must also consider

13  opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs

14  96-2p, 96-5p, 96-6p, and 06-3p.

15        The fourth step requires the ALJ to determine whether the individual has the RFC to perform his

16  past relevant work ("PRW").  *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f).  PRW means work

17  performed either as the individual actually performed it or as it is generally performed in the national

18  economy within the last fifteen years or fifteen years prior to the date that disability must be established.

19  In addition, the work must have lasted long enough for the individual to learn the job and to perform it

20  as SGA.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965.  If the individual has the

21  RFC to perform his past work, then a finding of not disabled is made.  If the individual is unable to

22  perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

23        Step five requires the ALJ to determine whether the individual is able to do any other work

24  considering his residual functional capacity, age, education, and work experience.  20 C.F.R.

25  §§ 404.1520(g) and 416.920(g).  If he or she can do other work, then a finding of not disabled is made.

26  Although the individual generally continues to have the burden of proving disability at this step, a

27  limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is

28  / / /

1  responsible for providing evidence that demonstrates that other work exists in significant numbers in

2  the national economy that the individual can do. *Yuckert*, 482 U.S. at 141-42.

3  **II.    Factual Background.**

4          **A.    Testimony at Administrative Hearing.**

5          An administrative hearing was held on September 2, 2010, before ALJ Craig Ellis, in Las

6  Vegas, Nevada.  AR 37.  At the time of the hearing, Plaintiff was thirty-seven years old, married, and

7  she lived with her husband and her two-year old daughter.  AR 39-40.  Plaintiff's ten year old step-

8  daughter resided with Plaintiff and her family on weekends.  AR 40, 41.  Plaintiff's husband is

9  employed as a bellman at the Hard Rock Hotel & Casino, and Plaintiff has health insurance through her

10 husband's employer. AR 40-41.

11         Plaintiff completed high school and approximately three years of college, but she had to quit

12 school because of her arthritis.  AR 41, 51.  She testified she was 5'9" tall and weighed 255 pounds.

13 AR 41.  Plaintiff was last employed at Las Vegas Day School as a teacher's aide in the pre-kindergarten

14 classroom.  AR 42-43.  She did that job for five years, ending in May 2008, when she left for maternity

15 leave.  AR 43-44.  Plaintiff testified she did not return for the new school year after her maternity leave

16 ended because her arthritis flared up after she gave birth on June 2, 2008.  AR 44.

17         Plaintiff testified that she traveled out of state to go to her parents' house when she was ill.  AR

18 45-46.  She said her parents either come to Las Vegas, or pick her up and drive her to their home in

19 Covina, California.  AR 45.  Plaintiff estimated that between June 2008 and September 2012, her

20 parents had taken care of her at least once every other month.  AR 48.

21         Plaintiff described her emotional health as "not well."  AR 49.  She testified that she was very

22 sensitive and cried easily and on a daily basis.  AR 50, 51.  She testified could not remember things that

23 were not written down, and she was forgetful.  AR 50.  She could not sit still or sleep because of her

24 pain.  *Id.*  Plaintiff was not sure whether or not she was depressed, and she was not taking any

25 medication for depression.  *Id.*  She also testified that none of her doctors had discussed taking an

26 antidepressant or seeking counseling.  AR 51. She testified that she has trouble writing for long periods

27 of time and cannot hold a hard back book to read because they are too heavy.  AR 52.  She stated she

28 could not walk comfortably for long distances without sitting down to rest.  AR 52-53.  She testified

1  that she has trouble walking down stairs, and she falls.  AR 53.  She and her family had to move houses

2  because she fell too frequently in their two-story home.  *Id.*  She testified that she constantly drops

3  dishes due to a lack of sensation in her fingers to hold things.  AR 53.  Plaintiff testified that she was

4  prescribed wrist braces years prior.  AR 54.  She also uses a wheelchair when she has to go places for a

5  long time.  AR 54-55.

6       Plaintiff testified she has pain and swelling in her hands, back, hips, toes, neck, and wrists.  AR

7  55.  Plaintiff takes a variety of medication, and she suffers from the following side effects: hair loss, dry

8  skin, diarrhea, vomiting, upset stomach, and lack of sleep.  AR 55-57.  She also testified that she has

9  gained approximately one hundred pounds due to her medication, and her medication caused rashes and

10  frequent urination.  AR 57.

11       She testified that her husband completed the household chores, and she had no regular social

12  activities at night.  AR 58.  Her husband helps her to bathe and dress.  AR 59.

13       Plaintiff's mother, Patricia Grecalvo,[4] testified that she and her husband have helped Plaintiff

14  during her arthritis flare ups by coming to stay with her or picking her up and taking her home to

15  California with them.  AR 63.  Ms. Grecalvo estimated that on a monthly or bimonthly basis, she and

16  her husband spent four or five days taking care of Plaintiff.  AR 63-64.  Her mother, a licensed

17  counselor, testified that she believed Plaintiff was clinically depressed, and Plaintiff would benefit from

18  antidepressant medication. AR 64.

19      **B.**    **Plaintiff's Medical Records.**

20         **1.**    **Dr. Steven E. Goldstein's Evaluation.**

21       Plaintiff was evaluated by Dr. Steven E. Goldstein, Ed.D., on August 28, 2008, for an extended

22  mental status examination. AR 385.  She reported having gained one hundred pounds of "water weight"

23  in two years.  *Id.*  She reported being unable to walk long distances or for long periods of time and

24  having to drop out of college because of cramps in her legs when she sits for long periods of time.  AR

25  386.  She told Dr. Goldstein she had been diagnosed with rheumatoid arthritis and fibromyalgia in

26

27         [4]It appears that Plaintiff's mother's name was phonetically spelled in the hearing transcript, and it

28  is properly spelled as "Grijalva."

February 1997. *Id.*  She indicated that she did not take any mental health medications at the time of the evaluation, but she was taking Ambien to sleep and Vicodan or Percoset for pain. AR 386.

She reported that on an average day, she woke between 7 and 8 am and changes her baby's diaper and feeds her. AR 390.  She lets the dogs out and in. *Id.*  She fixes herself breakfast, puts her baby down for a nap, and takes her medication. *Id.*  She takes a shower and gets dressed. *Id.*  She does one chore per day—dishes, laundry, or the like—after taking her pain medication, and she goes to bed early. *Id.*  She clarified that she only takes care of the baby twice per week. *Id.*  She can only prepare simple meals like sandwiches or cereal. *Id.*  She washes the laundry. *Id.*  Her husband cooks and does the heavy cleaning. *Id.*  She has two friends she speaks with "once in a while," and she last saw them two months before the appointment with Dr. Goldstein. *Id.*

Dr. Goldstein opined that based on Plaintiff's intellectual abilities, she would be able to understand, remember, and carry out complex instructions, as well as uncomplicated, and two-step instructions with no difficulties. AR 391.  She would also be able to maintain appropriate behavior with supervisors, the public, and her co-workers. *Id.*  Dr. Goldstein found that Plaintiff's psychological prognosis would depend on the medical care "she perceives she is receiving." *Id.*  He recommended Plaintiff be referred to a psychiatrist or psychologist for mental health care. *Id.*

### 2.      Dr Alan Berman's Evaluation.

Plaintiff underwent a disability evaluation on October 3, 2008, by Dr. Alan Berman, a medical doctor certified by the American Board of Physical Medicine and Rehabilitation. AR 404, 405.  Dr. Berman observed Plaintiff was "in no apparent distress" during the examination. AR 404.  He found no evidence of any active tenosynovitis or chronic synovial thickening. *Id.*  He measured Plaintiff's range of motion and found it was normal in all joints and all planes, except she was limited to fifty degrees forward spinal flexion and seventy degrees hip flexion. *Id.*  He found no joint adhesions or effusions. *Id.*  He found that Plaintiff did not have the features of fibromyalgia on examination. *Id.*  He opined it would be difficult for Plaintiff to do strenuous work, but she could perform sedentary work. *Id.*

/ / /

/ / /

/ / /

8

1    **3.    Dr. Christianne M. Yung**, **M.D.'s Treatment Notes.**

2         Dr. Yung began treating Plaintiff in 2004 for rheumatoid arthritis and fibromyalgia-related

3    problems. *See generally* AR 480-743.  Plaintiff saw Dr. Yung on essentially a monthly basis. *Id.*

4         Based upon Dr. Yung's treatment notes, Plaintiff suffered rheumatoid arthritis flares on

5    December 9, 2008, June 22, 2009, August 21, 2009, December 11, 2009, February 2, 2010, August 27,

6    2010; September 27, 2010; October 19, 2010, November 15, 2010, December 23, 2010, February 14,

7    2011, July 7, 2011, and August 5, 2011.  AR 480, 514, 521 536, 548, 650, 657, 664, 671, 688, 701, 729,

8    739. Physical examination showed no degenerative joint changes, and tenderness in the following areas:

9    lateral epicondyle, occiput, trapezium, lower cervical, second rib, supraspinatus, gluteal, greater

10   trochanter, and medical fat pad proximal to the knees. AR 517, 524, 539, 552, 654, 661, 668, 675, 692,

11   705, 733, 743.

12        Dr. Yung observed Plaintiff's rheumatoid arthritis was improved on  February 18, 2009, March

13   26, 2009, April 22, 2009, May 20, 2009, September 29, 2009, January 5, 2010, March 2, 2010,

14   December 13, 2010, January 10, 2011, March 11, 2011, and May 10, 2011. AR 487, 494, 500, 507,

15   533, 546, 558, 573, 682, 698, 712, 719.  Plaintiff reported her morning stiffness was better, she had less

16   joint pain, and she was not suffering from sleep disturbances. AR 487, 494, 500, 507, 527, 542, 554,

17   569, 678, 694, 708, 715.  On physical examination, Plaintiff had no degenerative joint changes, no

18   tenderness in the fibrocystic points, mild tenderness at Plaintiff's wrists, elbows, shoulders, hips, knees,

19   ankles, and feet, and muscle spasm in the lumbar region. AR 491, 494, 503, 510.   In April 9, 2010,

20   May 5, 2010, June 6, 2011, Plaintiff saw Dr. Yung.  AR 575, 582, 722. Physical examination showed

21   no degenerative joint changes, and tenderness in the following areas: lateral epicondyle, occiput,

22   trapezium, lower cervical, second rib, supraspinatus, gluteal, greater trochanter, and medical fat pad

23   proximal to the knees. AR 579, 586, 726. Dr. Yung's impression was Plaintiff's rheumatoid arthritis

24   was mild/stable. AR 579, 586, 726.

25        On June 1, 2010, July 1, 2010, Plaintiff saw Dr. Yung, and although she still complained of

26   morning stiffness and joint pain, acknowledged she was feeling better with a higher dose of Imuran. AR

27   596, 603. Physical examination still showed some tenderness in Plaintiff's joints and fibrocystic points,

28   but Dr. Yung's impression was that Plaintiff's rheumatoid arthritis was improved but not completely

controlled. AR 599-600, 606-07.  On July 30, 2010, Plaintiff reported to Dr. Yung she was feeling "great" although she still had morning stiffness and joint pain in her hands.  AR 610.  On physical examination, she had no degenerative joint changes, some tenderness in the fibrocystic points and joints, and muscle spasm. AR 614. Dr. Yung's impression was that Plaintiff's rheumatoid arthritis was improved. AR 614.

Dr. Yung drafted a letter dated August 25, 2010, stating that Plaintiff had been her patient since 2004 and was diagnosed with rheumatoid arthritis and fibromyalgia. AR 618. Dr. Yung wrote that over the years she had seen Plaintiff, "Ms. Webb has experienced frequent episodes of joint flares and reports she is unable to work due to pain." AR 618.

### 4.  Harmony Healthcare.

Plaintiff was referred to Harmony Health Care on September 15, 2010, for a psychiatric evaluation.  AR 632.  She reported her chief complaints were depressive symptoms.  AR 631.  She was prescribed Prozac and Cymbalta.  AR 633.  Plaintiff also attended a therapy session on October 25, 2010.  AR 634.

### 5.  Dr. Paglini's & Dr. Yao's Psychological Evaluation.

Drs. John Paglini, Psy.D., and Richard Yao, Ph.D, psychologically evaluated Plaintiff on November 12, 2010, for the Bureau of Disability Adjudication.  AR 620.  Dr. Yao, a post-doctoral intern working with Dr. Paglini, conducted the evaluation and  observed Plaintiff had a high level of depressive symptomology.  AR 621.  Plaintiff told him she was taking the depression medication Cymbalta and had started therapy with Dr. Stanton.  *Id.*  She rated her depression a nine on a scale of one to ten.  *Id.*  Plaintiff's MMPI-2 scores suggested the possibility of symptom exaggeration, a plea for help, or a high level of psychological distress.  AR 624.  Additionally, her scores suggested she converts psychological stress into physical symptoms.  *Id.*  Dr. Yao found Plaintiff was preoccupied with her somatic symptoms, including chronic pain, and her physical symptoms tend to exacerbate during times of stress.  *Id.*  He observed that Plaintiff likely preferred medical explanations for her symptoms because she lacked insight into the psychological factors underlying them.  *Id.*

In sum, Dr. Yao found Plaintiff had no limitation understanding and remembering simple instructions, carrying out simple instructions, or making judgments on simple work-related decisions.

1   AR 627.  He found Plaintiff was mildly impaired in understanding and remembering complex

2   instructions, carrying out complex instructions, and making judgments on complex work-related

3   decisions.  *Id.*  He found she was not limited in her ability to interact with co-workers or the public, but

4   would be mildly limited in interacting with her supervisors and responding to usual work situations and

5   changes in a work routine. AR 628.

6                     **6.    Southwest Medical Associates.**

7           On March 3, 2009, Plaintiff saw Dr. Gregory Middleton at Southwest Medical Associates for

8   her arthritis and fibromyalgia.  AR 821.  She told Dr. Middleton she exercises approximately three

9   times per week on a "gazelle" machine and walks regularly.  *Id.*  On physical examination, Dr.

10  Middleton observed mild inflammatory arthritis in both wrists but saw no other evidence of

11  inflammatory arthritis.  AR 822.

12          Plaintiff saw Dr. Middleton again on April 24, 2009, and he found "[n]o evidence of any

13  inflammatory arthritis is present."  AR 812.

14          In August 2009, Dr. Middleton noted that Plaintiff changed her medication without calling to

15  discuss it with him.  AR 792.  He found that "presently there are no physical findings suggesting active

16  rheumatoid arthritis."  AR 792.  He believed her symptoms were caused by fibromyalgia, and he

17  recommended consistent aerobic exercise to relieve her symptoms.  AR 792.  He did not believe

18  stronger narcotics would provide Plaintiff with long-term benefits.  AR 792.

19          In November 2009, Plaintiff saw Dr. Middleton.  AR 778.  He opined that her rheumatoid

20  arthritis was stable and controlled, and Plaintiff's pain was actually caused by fibromyalgia.  AR 778.

21          On March 10, 2010, Plaintiff went to SMA for the first time since November 2009.  AR 774.

22  The treatment notes reflect that Plaintiff called in December 2009 because she was doing worse because

23  of the stress of her daughter's surgery."  AR 774.  She was offered an appointment to come in and

24  refused it.  AR 774.  She also cancelled her appointment in January.  AR 774.  Additionally, Plaintiff

25  did not keep Dr. Middleton aware of medications prescribed by Dr. Yung, and Dr. Middleton informed

26  Plaintiff he could not ethically continue to prescribe her medication if he was not her treating physician.

27  AR 774-75.  Additionally, Dr. Middleton noted that although Plaintiff had rheumatoid arthritis, he

28  believed her symptoms were caused by fibromyalgia, and her arthritis was under good control.  AR 775.

1       On September 14, 2010, Plaintiff saw Dr. Middleton for depression and requested a referral to a

2   psychiatrist.  AR 760.  The notes reflect that Plaintiff's depression was "not new."  AR 760.

3       Plaintiff saw Dr. Yolanda Flores at SMA on November 28, 2011, and Plaintiff reported that

4   overall, she was doing well.  AR 914.

5   **III.**   **The ALJ's Decision.**[5]

6       The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520

7   and 416.920 and issued an unfavorable decision on January 25, 2010.  At step one, the ALJ found

8   Plaintiff had not engaged in SGA since May 31, 2008, the amended alleged onset date.  AR 21.

9   At step two, the ALJ found Plaintiff had the following severe impairments: rheumatoid arthritis and

10  fibromyalgia.  *Id.*  He also found Plaintiff had the following non-severe impairments: depressive

11  disorder and pain disorder with psychological factors and a general medical condition.  *Id.*  In making

12  his findings at step two, the ALJ specifically considered all of Plaintiff's medically determinable

13  impairments, including her non-severe impairments of depressive disorder and pain disorder.  *Id.*  He

14  concluded that her non-severe impairments did not cause more than minimal limitation in Plaintiff's

15  ability to perform basic mental work activities and was, therefore, non-severe.  *Id.*

16      The ALJ also specifically considered the Paragraph B criteria in Listing 12.00C of the Listing of

17  Impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.  AR 24.  He concluded that the

18  greater weight of the evidence showed Plaintiff suffered mild limitation in activities of daily living,

19  mild limitation in social functioning, mild limitations in concentration, persistence of pace, and no

20  episodes of decompensation of extended duration.  *Id.*  In doing so, he found Plaintiff took care of her

21  baby with Down Syndrome, as well as two dogs and one cat.  *Id.*  He found she went out daily and

22  alone, drove a car, and shopped for groceries.  *Id.*  She could take care of household tasks, including

23  changing her daughter's diapers, feeding her daughter, preparing simple meals of cereal or sandwiches,

24  and folding laundry.  *Id.*  Plaintiff had not suffered any episodes of decompensation, and she maintained

25  / / /

26

27      [5]During the hearing, Plaintiff amended her alleged disability onset date to May 31, 2008.  AR 21.
    The ALJ found Plaintiff met the insured status requirements of the Social Security Act through

28  December 31, 2013.  *Id.*

1   good relationships with her family and friends. *Id.* He also found Plaintiff had never sought treatment

2   for her alleged depression of taken any medication to treat it. *Id.*

3          The ALJ considered the opinion of psychiatric consultative examiner Dr. Steven Goldstein, who

4   examined Plaintiff in August 2008 and determined Plaintiff's mental impairments only minimally

5   impaired her ability to function. *Id.* The ALJ gave "great weight" to Dr. Goldstein's opinion because it

6   was consistent with the record as a whole. *Id.* The ALJ also considered the opinion of psychiatric

7   consultative examiner Dr. John Paglini, who examined Plaintiff in November 2010 and also determined

8   Plaintiff's mental impairments only minimally impaired her ability to function. *Id.* The ALJ gave

9   "great weight" to Dr. Paglini's opinion because it was consistent with the record a whole. AR 25.

10         At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of

11  impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,

12  Subpart P, Appendix 1, including Listing 14.09. AR 25. He specifically discussed each subpart of

13  Listing 14.09, which he found Plaintiff did not meet. *Id.*

14         After consideration of the entire record, the ALJ concluded that Plaintiff had the RFC to

15  perform a full range of light work as defined in 20 C.F.R. 404.1567(b). AR 25. The ALJ found that the

16  weight of the evidence in the AR revealed that although Plaintiff was unable to perform work at the

17  light exertional level during specific periods of time due to her rheumatoid arthritis, such periods did

18  not last for at least a continuous twelve-month period. AR 26. He found Plaintiff suffered flare-ups of

19  her rheumatoid arthritis in December 2008, January 2009, July 2009, August 2009, December 2009,

20  and February 2010. *Id.* Despite these flare-ups, the ALJ found that Plaintiff's treatment records from

21  Dr. Christianne Yung, Plaintiff's treating physician. showed that before and after the flare-ups,

22  Plaintiff's rheumatoid arthritis consistently improved. *Id.*

23         Additionally, the ALJ considered the opinion of orthopedic consultative examiner Dr. Alan

24  Berman, who examined Plaintiff in October 2008 and found she was not disabled. AR 27. The ALJ

25  gave "great weight" to Dr. Berman's opinion that Plaintiff had an RFC of light exertional level because

26  it was consistent with the record as a whole. *Id.* Likewise, the ALJ considered the opinion of state

27  agency physician Dr. J. R. Saphir, who opined in October 2008 that Plaintiff was "not disabled" and

28  could perform light work. *Id.* The ALJ specifically observed that although Dr. Saphir was a non-

1  examining physician, his opinion did not deserve as much weight as an examining or treating physician,

2  but it did deserve some weight, "especially in a case like this in which there exist a number of other

3  reasons to reach similar conclusions (as explained throughout this decision)." *Id.*

4       The ALJ also considered treatment notes from Plaintiff's treating physician Dr. Yung. *Id.*

5  Specifically, the ALJ found that Plaintiff's inability to work was not Dr. Yung's opinion, but was

6  instead reported to Dr. Yung by Plaintiff herself. *Id.* The ALJ found Dr. Yung's treatment notes did

7  not reveal Dr. Yung placed or recommended any restrictions on Plaintiff's activities. *Id.* The ALJ,

8  therefore, gave Dr. Yung's statement that Plaintiff was unable to work little weight because it was

9  inconsistent with Dr. Yung's own treatment notes. *Id.*

10      The ALJ also found that Plaintiff's reported symptoms were disproportionate to the objective

11  findings of the medical record, inconsistent with the medical opinion evidence, exaggerated, not fully

12  credible, and Plaintiff's MMPI test results also suggested symptom exaggeration. AR 28-29. The ALJ

13  supported this finding with specific references to inconsistencies in the record. *Id.* Additionally, the

14  ALJ observed that Plaintiff reported generally the same symptoms before the amended onset date, when

15  she was working, strongly suggested her symptoms would not currently prevent work. AR 29. The

16  ALJ therefore concluded that Plaintiff's statements concerning the intensity, persistence, and limiting

17  effects of her symptoms were not credible to the extent they were inconsistent with the ALJ's RFC

18  assessment.

19      At step five, the ALJ found Plaintiff was capable of performing her PRW as a teacher's aide and

20  was not under a disability from May 31, 2008, through the date of the ALJ's decision.

21  **IV.    The Parties' Positions.**

22      Plaintiff asserts that the ALJ erred in failing to include the mental limitation he found Plaintiff

23  suffered from in his assessment of Plaintiff's RFC and in the hypothetical he presented to the vocational

24  expert. Plaintiff contends this error is material given the skilled nature of Plaintiff's PRW as a teacher's

25  aide. Even a mild limitation in social functioning and concentration, persistence, and pace would

26  impact  Plaintiff's ability to do her PRW of interacting with students, grading student work, and

27  maintaining order in the classroom. In support of her argument, Plaintiff relies on an unpublished

28  Ninth Circuit decision in *Hutton v. Astrue*, 491 Fed. Appx. 850 (9th Cir. 2012), where the Ninth Circuit

1  reversed because the ALJ failed to consider the claimant's mild post-traumatic stress disorder

2  ("PTSD").

3          In response, the government asserts that Plaintiff misunderstands the use of the psychiatric

4  technique described at 20 C.F.R. § 404.1520a.  Namely, the government asserts the purpose of the

5  regulation is to determine the severity of a claimant's condition, and if it is determined to be severe,

6  then the regulation is used to determine whether a claimant meets or equals a Listing.  Here, the

7  government contends the ALJ properly concluded that because the greater weight of the evidence

8  revealed Plaintiff had mild limitations in her activities of daily living; mild limitations in social

9  functioning; mild limitations in maintaining concentration, pace, or persistence; and no episodes of

10 decompensation of extended duration, her mental impairments were not severe.  Therefore, pursuant to

11 20 C.F.R. 404.1520a(d)(1), the ALJ assessed Plaintiff's RFC.  The regulations require the ALJ to

12 consider Plaintiff's mental limitations in fashioning the RFC; they do not require the ALJ to include

13 them.  Here, the ALJ considered Plaintiff's mild mental limitations.

14         Additionally, there was no vocational expert testimony at the hearing, and therefore, the ALJ did

15 not err in presenting a hypothetical.  Furthermore, Plaintiff's reliance on *Hutton* is misplaced because

16 there, the ALJ did not consider the claimant's PTSD because the ALJ discounted the claimant's

17 credibility in that regard.  Here, the ALJ considered Plaintiff's mental impairments.  He did not negate

18 the existence of Plaintiff's non-severe mental impairment like the ALJ in *Hutton.*  Additionally, the

19 government contends that substantial evidence supports the ALJ's conclusion that Plaintiff could

20 perform a full range of light work despite her mental limitations.  Relying on *Pinto v. Massanari,* 249

21 F.3d 840, 846 (9th Cir. 2001), the government asserts the ALJ properly concluded that Plaintiff's PRW

22 did not exceed her RFC, and she could perform it.

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1    **V.      Analysis and Findings**

2        Reviewing the record as a whole, weighing both the evidence that supports and the evidence that

3    detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial

4    evidence, and the ALJ did not commit legal error.  Plaintiff argues the ALJ erred at step four of the

5    analysis in determining Plaintiff's RFC.[6]  Relying on *Hutton v. Astrue,* 491 Fed. Appx. 850, Plaintiff

6    asserts that the ALJ should have performed a more detailed analysis of Plaintiff's mental impairments.

7    20 C.F.R. § 404.1545(a)(2) requires that an ALJ consider all limitations when assessing a claimant's

8    RFC, even if those limitations are found to be non-severe.  *Id.*  ("We will consider all of your medically

9    determinable impairments of which we are aware, including your medically determinable impairments

10   that are not 'severe' . . .  when we assess your residual functional capacity.")

11       *Hutton* is an unpublished decision that is not binding precedent on this court.[7]  There, the Ninth

12   Circuit found an ALJ erred by failing to include the claimant's PTSD in the assessment of the

13   claimant's RFC.  At step two the ALJ determined the claimant's PTSD existed but was nonsevere

14   pursuant to 20 C.F.R. § 404.1520a(c)(3).  The court observed that pursuant to 20 C.F.R. §

15   404.1545(a)(2), the ALJ was required to consider the PTSD in determining the claimant's RFC, but he

16   did not.  *Id.* at 850-51.  Instead, the ALJ discredited the claimant, his treating physicians' opinions and

17   the Veterans Administration's disability rating.  *Id.* at 850.  The court did not, however, base its reversal

18   on these actions by the ALJ.  *Id.*  Instead, the court took exception to the ALJ's mischaracterization of

19   the claimant's wife's testimony, finding that the claimant lacked credibility.  *Id.*  The ALJ found the

20   claimant's PTSD claims were "in great doubt" and excluded the claimant's PTSD from consideration.

21   *Id.*  The Ninth Circuit held this was legal error.

22       Here, the ALJ specifically considered Plaintiff's non-severe mental impairments in evaluating

23   Plaintiff's RFC.  In particular, he considered the opinion of consultative examiner Steven Goldstein,

24

25   _____

26       [6]Plaintiff also argues the ALJ erred by failing to include Plaintiff's mental limitations in the
     hypothetical to the vocational expert.  No vocational expert testified at the administrative hearing.  AR

27   37-64.  Therefore, this argument is without merit.

28       [7]*See generally* Fed. R. App. Proc. 32.1.

who diagnosed pain disorder and depressive disorder, but opined Plaintiff could understand, remember and carry out simple and complex instructions and could maintain appropriate behavior with her co-workers, supervisors, and the public.  AR 24.  Additionally, the ALJ considered the opinions of Drs. Paglini and Yao, who diagnosed pain disorder and depressive disorder, and opined that Plaintiff's mental impairments only mildly impaired her ability to function.  *Id.*  The ALJ specifically noted at the conclusion of his step two analysis that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  AR 25.  Although the ALJ did not extensively discuss Plaintiff's mental impairments at step four, he thoroughly discussed the evidence supporting his findings at step two and incorporated them by reference in his RFC analysis.  An ALJ is required to discuss and evaluate evidence that supports his conclusion; he is not required to do so under any specific heading.  *See Lewis v. Apfel*, 236 F.3d 503. 513 (9th Cir. 2001).  The court finds the ALJ considered Plaintiff's mild mental limitations in his RFC analysis.

Additionally, the court finds that the ALJ properly found Plaintiff could perform her PRW as a teacher's aide.  The ALJ properly reviewed Plaintiff's RFC and the physical and mental demands of the work she previously performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f); *see also Berry v. Astrue,* 622 F.3d 1228, 1231 (9th Cir. 2010).  The ALJ determined Plaintiff had the RFC to perform a full range of light work, and he found that she could perform such work as it is customarily performed and as she actually performed it.  AR 25-29.  The ALJ's RFC finding specifically incorporated Plaintiff's mild limitations in mental functioning.  AR 25.  Plaintiff's argument that she is not able to interact with students, grade student work, or maintain order in the classroom is unsupported by any citation to the AR or any case law.

Furthermore, as the ALJ observed, Plaintiff's medical records show that her impairments were present at approximately the same level of severity prior to the amended alleged disability onset date.  AR 29.  Plaintiff reported generally the same symptoms and experienced the same flareups before the amended alleged onset date, yet she continued to work.  *Id.*  The ALJ found that the fact that the impairments did not prevent Plaintiff from working at the time "strongly suggests it would not currently prevent work."  *Id.*  Plaintiff testified that she left her former work in May 2008 to take medical leave for her pregnancy and not due to her impairments.  Additionally, her treatment records do not show any

17

worsening or change in reported symptoms after that time. *Id.* As set forth above, the ALJ found Plaintiff's mild mental limitations were not sufficiently severe to limit her ability to work at the light extertional level, and the ALJ appropriately determined Plaintiff could perform her PRW as a teacher's aide.

**VI.    Conclusion**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's. *Flaten*, 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).  For all of the foregoing reasons,

**IT IS RECOMMENDED**:

1.      Plaintiff's Motion to Remand (Dkt. #24) be DENIED.

2.      The Commissioner's Cross-Motion to Affirm (Dkt. #27) be GRANTED.

Dated this 14th day of August, 2013.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE